**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x

In re:                                                                  Chapter 7

Michael C. Culver,                                          Case No. 23-35334 (CGM)

                                    Debtor.
----------------------------------------------------------------x

## MEMORANDUM OF DECISION

Before the Court is the above captioned *Motion to Avoid Liens* [ECF No. 14][1] (the "Motion") filed by Michael C. Culver, through his counsel (the "Debtor"). The Motion sought to avoid three judgment liens by (i) Road Atlanta LLC (the "Creditor"), (ii) Blank Rome LLP, and (iii) M&T Bank, f/k/a People's United Bank. The Creditor[2] and M&T Bank filed objections to the Motion, with Blank Rome LLP taking no position. On February 21, 2025, the Debtor and M&T Bank entered into a settlement agreement and order settling M&T Bank's objection to the Motion. *See Settlement Agreement and Order Settling M&T Bank's Objection to the Debtor's Motion to Avoid Judgment Liens* [ECF No. 146] (the "M&T Settlement").[3] In dispute is the Motion, the Creditor's Objection, and various letters and declarations filed by the Debtor and Creditor (the "Parties") in support of their respective positions. *See* Motion; Objection; *Reply to Motion* [ECF No. 49] ("Debtor's Reply"); *Declaration of Dan Melville, Certified Real Estate Appraiser for Creditor, Road Atlanta, LLC* [ECF No. 164] ("Creditor's Declaration"); *Letter filed by Debtor* [ECF No. 174] ("Debtor's Letter"); *Reply Letter filed by Creditor* [ECF No. 176] ("Creditor's

---

[1] Unless otherwise noted, all Case Management/Electronic Case Filing ("ECF") references in this Memorandum of Decision are to Case No. 23-35334.

[2] The Creditor's objection to the Motion was filed on September 15, 2023 [ECF No. 25] (the "Objection").

[3] The M&T Settlement provides, in pertinent part, that M&T Bank shall reclassify its proof of claim to a general unsecured claim in the reduced amount of $911,061.57 after Debtor remits $8,000.00 to M&T Bank. *See* M&T Settlement at ¶¶ 2,4.

Reply"); *Declaration of Ms. Lee McEnroe, Debtor's Certified Appraiser* [ECF No. 178] ("Debtor's Declaration"). The Court held an evidentiary hearing on August 18, 2025 (the "Trial")[4] to hear the Parties' remaining factual contentions[5] with respect to the Motion. The Court directed the Parties to file closing statements no later than two weeks after the Trial transcript was entered on the docket. The Trial transcript was entered on the docket on September 17, 2025. *See Transcript Regarding Hearing Held on 8/18/2025* [ECF No. 197] ("Trial Transcript"). On October 1, 2025, Creditor and Debtor filed their respective closing statements. *See Road Atlanta, LLC's Closing Statement Related to Trial Held on August 18, 2025* [ECF No. 198] ("Creditor's Closing Statement"); *Debtor's Closing Statement Related to Trial Held on August 18, 2025* [ECF No. 199] ("Debtor's Closing Statement"). For the reasons set forth below, the Court denies the Motion and sustains the Objection because the Creditor's lien does not impair the Debtor's homestead exemption, based on the (i) maximum homestead exemption allowed for properties in Dutchess County, which is $125,000.00, (ii) fact that a tenant by the entirety's undivided interest should be valued at the full amount of equity in the homestead for lien avoidance purposes, and (iii) full fair market value of the Property as determined by the Creditor's Appraisal, which is $2,500,000.00.

---

[4] The Trial was conducted remotely via Zoom for numerous reasons. Pursuant to Rule 43(a) of the Federal Rules of Civil Procedure ("FRCP"), the court may permit remote testimony by virtual means "[f]or good cause in compelling circumstances." Fed. R. Civ. Pro. 43(a). Among other reasons, good cause and compelling circumstances existed because of a party's physical injury which prohibited him from driving a vehicle. *See id.*, *Advisory Committee's Note to 1996 Amendment* ("The most persuasive showings of good cause and compelling circumstances are likely to arise when a witness is unable to attend trial for unexpected reasons, such as accident or illness, but remains able to testify from a different place."). Importantly, all parties consented to a remote trial. Further, the Court did not begin the Trial until the parties gave explicit waivers on the record with respect to the "open court" requirement pursuant to FRCP 43(a). *See* Trial Tr. at 11:24–13:6 (each party confirming that he or she was fully informed and waived the "open court" requirement).

[5] The remaining legal contention regarding valuation of property for lien avoidance purposes when only one tenant by the entirety files for bankruptcy, while still in dispute, was not the subject of the evidentiary Trial. However, this Memorandum of Decision addresses the legal dispute as set forth in the Motion, Objection, and Debtor's Reply, consistent with the Court's remarks at the Trial. *See* Trial Tr. at 13:19–14:18.

## BACKGROUND

On April 28, 2023 (the "Petition Date"), Debtor filed for bankruptcy under Chapter 7 of title 11 of the United States Code (the "Bankruptcy Code"). *See Chapter 7 Voluntary Petition for Individuals* [ECF No. 1] (the "Petition"). On August 14, 2023, Debtor filed the Motion seeking to avoid certain judicial liens filed against the Property (as defined herein) pursuant to section 522(f) of the Bankruptcy Code. *See* Motion. The Debtor's primary residence is located in Dutchess County at 162 Amenia Union Road, County Route 2, Amenia, New York 12501 (the "Property") and the Debtor jointly owns the Property with his non-filing spouse, Michele Browne. *See* Petition, Schedule A/B, at 1; *see also* Motion at ¶ 5. The Motion lists the value of the Property to be $1,925,000.00 based on an appraisal by Lee McEnroe of LMH Appraisal, a New York State Certified Residential Real Estate Appraiser (the "Debtor's Appraiser"). *See* Motion at ¶ 6; Motion, Ex. B; *see also* Debtor's Declaration.

Debtor claimed a New York State homestead exemption of $149,975.00. *See* Motion at ¶ 7; *see also* Petition, Schedule C, at 1. The Debtor's claimed homestead exemption exceeds the maximum exemption provided for properties in Dutchess County under N.Y. C.P.L.R. § 5206(d). *See* N.Y. C.P.L.R. § 5206(d) (providing for a maximum $125,000.00 homestead exemption for properties located in Dutchess County). The prepetition judgment liens filed against the Property are as follows: (1) a judgment in favor of Blank Rome LLP in the amount of $56,253.69, recorded on March 4, 2016 at 2:43 p.m. (prevailing Eastern Time) in the Office of the Dutchess County Clerk; (2) a judgment in favor of Creditor in the amount of $125,811.87, recorded on December 28, 2018 at 11:53 a.m. (prevailing Eastern Time) in the Office of the Dutchess County Clerk; and (3) a judgment in favor of M&T Bank in the amount of $919,061.57, recorded on May 14, 2021 at 2:10 p.m. (prevailing Eastern Time) in the Office of the Dutchess County Clerk (collectively,

the "Judgment Liens").  *See* Motion at ¶ 9.  In addition to the Judgment Liens, as of the Petition

Date, there was a mortgage balance on the Property in the amount of $1,628,837.21 held by

Salisbury Bank and Trust Company (the "Salisbury Mortgage").  *See id.* at ¶¶ 8, 11.  According to

the Motion, the impairment of the Debtor's homestead exemption exceeds the value of the

Judgment Liens after accounting for the Salisbury Mortgage.[6]  *See id.* at ¶¶ 11, 13.  As explained

above, M&T Bank ultimately settled its objection to the Motion with Debtor pursuant to the M&T

Settlement, and Blank Rome LLP did not object to the Motion seeking to avoid its judicial lien.

*See supra* at ¶ 1.

On September 15, 2023, Creditor filed the Objection to the Motion.  *See* Objection.  The

Objection claims that the Debtor incorrectly reduced the market value by half to account for his

non-filing spouse.  *See id.* at ¶ 6.  The Objection points out that under New York law, when only

one tenant by the entirety files for bankruptcy, his undivided interest should be valued at the full

amount of the equity in the homestead for lien avoidance purposes.  *See id.* at ¶ 5 (citing New York

cases).

On January 30, 2024, Debtor filed a reply to Creditor's Objection.  *See* Debtor's Reply.

Debtor cites a case within the First Circuit, *In re Minkina (Rodgers, Powers & Swartz LLP v.*

*Minkina)*, 79 F.4th 142 (1st Cir. 2023), for support that a tenant by the entirety's interest should be

valued at half of the equity in the homestead for lien avoidance purposes.  *See id.* at ¶ 12.  Debtor

argues that section 363(h) of the Bankruptcy Code, which allows the trustee to sell a debtor's

interest in property held by tenants by the entirety, requires the trustee to turn over half of the

---

[6] After subtracting the Salisbury Mortgage from the fair market value of the Property based on the Debtor's Appraisal (as defined herein), the Debtor avers that his interest in the Property is $148,081.40.  *See* Motion at ¶ 11.  The Debtor came to this number after deducting the Salisbury Mortgage balance of $1,628,837.21 from the appraised value of $1,925,000.00, and then dividing the equity of $296,162.79 in half based on the Debtor's wife's undivided half ownership in the Property as a tenant by the entirety with the Debtor.  *See id.* n. 1.

proceeds to the non-debtor spouse and that a similar method should be used for lien avoidance purposes under section 522(f)(2)(A) of the Bankruptcy Code. *See id.* at ¶ 14. Finally, Debtor argues that because the death of a spouse entitles the living spouse to a separate apportionment of their own homestead exemption, a tenant by the entirety's interest in a homestead should be valued at half of the equity in the homestead when only one tenant by the entirety files for bankruptcy relief. *See id.* at ¶ 15.

On November 22, 2024, counsel to Debtor conducted a deposition of Dan Melville, the Creditor's appraiser, and counsel to Creditor conducted a deposition of Lee McEnroe, the Debtor's appraiser. *See Debtor/Movant's Trial Exhibits*, Ex. 3 [ECF No. 192] ("Deposition of Creditor's Appraiser"); *Creditor's Trial Exhibits*, Ex. F [ECF No. 193] ("Deposition of Debtor's Appraiser," together with the Deposition of Creditor's Appraiser, the "Depositions").

The Court held eleven (11) hearings on the Debtor's Motion, Creditor's Objection, and the related letters filed by the Parties between February 6, 2024, and July 9, 2025. At the January 15, 2025, hearing, the Court ordered the Parties to file a joint pre-trial order by February 12, 2025. The Parties failed to file a joint pre-trial order by February 12, 2025,[7] and at the February 12, 2025, hearing, the Court again ordered the Parties to file a joint pre-trial order, this time by April 9, 2025, which was supposed to be a pre-trial hearing. The Parties failed to file a joint pre-trial order by April 9, 2025, at which point the Court adjourned the matter to May 7, 2025, ordering the Parties

---

[7] At the January 15, 2025, hearing, counsel for Debtor stated that she would prepare and submit a final joint pre-trial order on behalf of Debtor and Creditor prior to the February 12, 2025, hearing. Approximately two weeks after the January 15, 2025, hearing, having not received a draft joint pre-trial order from Debtor's counsel, Creditor's counsel sent an email to Debtor's counsel requesting a proposed joint pre-trial order for review. *See* Creditor's Reply at ¶ 3; *id.*, Ex. A. Counsel for Debtor failed to respond to counsel for Creditor prior to the February 12, 2025, hearing, and sent an incomplete draft of the joint pre-trial order to counsel for Creditor on February 13, 2025, one day after the Court ordered the Parties to submit a final joint pre-trial order. *See id.* at ¶¶ 2, 4; *see also id.*, Ex. B (when Debtor's counsel sent the initial draft of the joint pre-trial order to Creditor's counsel, counsel to Debtor admitted that she did not "have time to complete [her] draft" because "[she] ha[d] a bunch of deadlines . . . ."); Debtor's Letter at ¶ 3.

to file a joint pre-trial order along with their appraisals and the biographies of their appraisers by May 7, 2025.  Continuing the pattern, the Parties failed to file a joint pre-trial order (or appraisals or biographies of those appraisers) by the May 7, 2025, hearing date.  At the May 7, 2025, hearing, counsel for Creditor explained the delay, stating that he had submitted comments to a joint pre-trial order to counsel for Debtor over a month ago as of that date and had not received a response. Indeed, in the Creditor's Reply, Creditor attaches proof that counsel for Creditor submitted a proposed joint pre-trial order to counsel for Debtor on April 2, 2025, and that counsel for Debtor failed to respond until April 9, 2025, at 8:58 a.m. (prevailing Eastern Time)—just two minutes before the April 9 hearing.[8]  *See* Creditor's Reply, Exs. C, E.  Both parties indicated at the May 7, 2025, hearing that they had exchanged their appraisals and biographies of their appraisers with each other and had conducted depositions of their respective appraisers.  Thus, at the May 7, 2025, hearing, the Court suggested a trial date of May 19, 2025, but counsel for Debtor indicated she was out from May 16, 2025, through May 23, 2025.  The Court therefore set the trial for May 30, 2025.

On May 22, 2025, counsel for Creditor submitted his appraisal and a declaration and biography of his appraiser.  *See* Creditor's Declaration.[9]  Creditor's Declaration includes a declaration of Dan Melville, a New York State Certified Residential Real Estate Appraiser (the "Creditor's Appraiser"), and an appraisal showing a $2,500,000.00 valuation of the Property.  *See id.* at ¶ 1.  On May 27, 2025, counsel for Debtor requested an adjournment of the May 30 trial due

---

[8] The Creditor's Reply also attaches proof that counsel to Creditor reminded counsel for Debtor to send any comments to the proposed joint pre-trial order on April 8, 2025.  *See* Creditor's Reply, Ex. D.  In Debtor's response dated April 9, 2025, at 8:58 a.m. (prevailing Eastern Time)—two minutes before the hearing—Debtor's counsel responded that she was "so sorry for the delay" and suggested they "be in touch before the next court date" but failed to provide any comments to the proposed joint pre-trial order sent by counsel to Creditor.  *Id.*, Ex. E.

[9] In response to a request by the Court, Creditor filed the full trial package mailed to the Poughkeepsie chambers in advance of the Trial.  *See Creditor's Trial Exhibits* [ECF No. 193].

to "two very unexpected tragic events" in an email to the Court.  The very next day, however, counsel for Debtor appeared in front of the Honorable Judge Lane for a Chapter 11 case.[10]  The Court adjourned the trial to July 9, 2025, based upon counsel for Debtor's adjournment request.  On May 28, 2025, counsel for Creditor submitted a pre-trial order for the Creditor only, that is, without the Debtor's input.  *See Pre-Trial Order* [ECF No. 172] (the "Pre-Trial Order").  On June 2, 2025, counsel for Debtor filed a letter admonishing counsel for Creditor for filing the Pre-Trial Order without her input and attached a separate pre-trial order for the Debtor only.  *See Debtor's Letter*.  On June 6, 2025, counsel for Creditor filed a responsive letter explaining that he unilaterally filed the Pre-Trial Order because of counsel for Debtor's continued lack of responsiveness and cooperation in the matter.  *See* Creditor's Reply.  On July 9, 2025, over thirty (30) minutes into the hearing, counsel for Debtor filed her appraisal and declaration of her appraiser, along with a declaration of the Debtor in support of his Motion and appraisal.  *See Debtor's Declaration*.[11]

On July 16, 2025, consistent with the Court's oral directives at the July 9, 2025, hearing, the Court entered a pre-trial order setting forth the procedures for the trial to be held on August 18, 2025.  *See Pre-Trial Order* [ECF No. 188] (the "Court's Pre-Trial Order").  The Court's Pre-Trial

---

[10] The Court notes that Debtor's counsel appeared before the Honorable Judge Lane on May 28, 2025, even though Debtor's counsel indicated on May 27, 2025, that she was unable to appear in front of the Honorable Cecelia Morris on May 30, 2025.  Counsel to Debtor's appearance in front of Judge Lane on May 28, 2025, is relevant to history of these proceedings, particularly with respect to the delay caused by counsel to Debtor that, in part, prompted the entry of the Court's Pre-Trial Order (as defined herein), which was ultimately withdrawn at the Trial.  Although courts may, in some circumstances, take judicial notice of proceedings in other cases, *see, e.g.*, *Sam & Mary Hous. Corp. v. Jo/Sal Mkt. Corp.*, 474 N.Y.S.2d 786, 789 (1984), *aff'd*, 479 N.E.2d 821 (1985) ("In New York, courts may take judicial notice of a record in the same court of . . . some other action.") (citing *Rossbach v. Rosenblum,* 20 N.Y.S.2d 725, *aff'd*, 31 N.E.2d 509), *see also In re Olsen*, 397 B.R. 379, 380 (Bankr. N.D. Ill. 2006) (taking judicial notice of attorney's appearances in other cases), there is no transcript or docket entry publicly available reflecting counsel's appearance before Judge Lane on that date.  The Court therefore does not take judicial notice of that appearance but simply notes it as part of the procedural background of this matter.

[11] In response to a request by the Court, Debtor filed the full trial package mailed to the Poughkeepsie chambers in advance of the Trial.  *See Debtor/Movant's Trial Exhibits* [ECF No. 192].

Order provided, among other things, that Counsel to Debtor may not call an expert witness to testify on direct examination. *See id.*, Part VI. On July 29, 2025, counsel for Debtor appealed the Court's Pre-Trial Order. *See Notice of Appeal* [ECF No. 189]. On October 7, 2025, the Honorable Cathy Seibel dismissed the appeal for failure to prosecute. *See Order of U.S. District Court Judge* [ECF No. 201]. The Court orally withdrew the Court's Pre-Trial Order at the beginning of the Trial and allowed the Debtor to call an expert witness to testify on direct examination and otherwise afforded counsel to Debtor all other rights to fully and fairly plead his case.

## **STANDARD**

Section 522(f) of the Bankruptcy Code allows a debtor to avoid a creditor's interest in their property if that property would be exempt but for the existence of the creditor's lien. *See* 11 U.S.C. § 522(f).[12] The statute provides a formula: liens can be avoided when the sum of all liens on the property and the value that the debtor could claim as exempt (were there no liens) exceed the value of the debtor's interest in the property in the absence of any liens. *See id.* at § 522(f)(2)(A). That is, when the value of all liens plus the homestead exemption is greater than the debtor's interest in the property, the lien can be avoided. A debtor bears the burden of proof by a preponderance of the evidence on every element of section 522(f) of the Bankruptcy Code. *See In re Armenakis*, 406 B.R. 589, 604 (Bankr. S.D.N.Y. 2009) (citations omitted).

---

[12] Section 522(f)(1) provides that "[n]otwithstanding any waiver of exemptions but subject to paragraph (3), the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section, if such lien is—(A) a judicial lien, other than a judicial lien that secures a debt of a kind that is specified in section 523(a)(5); or (B) a nonpossessory, nonpurchase-money security interest in any—(i) household furnishings, household goods, wearing apparel, appliances, books, animals, crops, musical instruments, or jewelry that are held primarily for the personal, family, or household use of the debtor or a dependent of the debtor; (ii) implements, professional books, or tools, of the trade of the debtor or the trade of a dependent of the debtor; or (iii) professionally prescribed health aids for the debtor or a dependent of the debtor." 11 U.S.C. § 522(f)(1).

Section 5206(d) of N.Y. C.P.L.R. provides that debtors may claim a maximum homestead exemption[13] of $125,000.00 for properties in Dutchess County.  *See* N.Y. C.P.L.R. § 5206(d).

New York law recognizes several categories of real property title ownership, including tenancy by the entirety and tenancy in common.  Under section 6-2.2(b) of the New York Estates, Powers and Trusts Law, "[a] disposition of real property to a husband and wife creates in them a tenancy by the entirety, unless expressly declared to be a joint tenancy or tenancy in common." N.Y. Est. Powers & Trusts Law § 6-2.2(b) (2024).  A tenancy by the entirety is "a tenancy whose salient characteristic is the unique relationship between a husband and his wife each of whom is seized of the whole and not of any undivided portion of the estate []."  *In re Heaney*, 453 B.R. 42, 46 (Bankr. E.D.N.Y. 2011) (quoting *Reister v. Town Bd. of Town of Fleming*, 218 N.E.2d 681, 682 (1966)).  Since each tenant by the entirety is seized of the whole property, "when only one tenant by the entirety files a bankruptcy petition, the full fair market value of the principal residence as of the petition date must be considered in calculating whether the debtor may avoid one or more judicial liens."  *In re Moltisanti*, No. 10-72180-ast, 2012 WL 5246509, at *3 (Bankr. E.D.N.Y. Oct. 24, 2012); *see also In re Heaney*, 453 B.R. at 47–48; *Levinson v. R&E Prop. Corp.*, 395 B.R. 554, 558–59 (Bankr. E.D.N.Y. 2008); *In re Armenakis*, 406 B.R. at 617; *In re Healey*, No. 16-70290-ast, 2017 WL 4838557, at *2 (Bankr. E.D.N.Y. Oct. 24, 2017); *In re Martin*, No. 13-70064-ast, 2013 WL 3956384, at *2 (Bankr. E.D.N.Y. July 25, 2013).

---

[13] The Debtor's non-filing spouse's homestead exemption is not included in the calculation because her undivided half-interest in the Property is not property of the estate.  *See In re Raskin*, 505 B.R. 684, 686 (Bankr. D. Md. 2014). This is consistent with caselaw discussing whether judicial liens impair a *Debtor's* homestead exemption when the debtor owns property as a tenant by the entirety with his non-filing spouse.  *See, e.g.*, *In re Heaney*, 453 B.R. 42, 49 (Bankr. E.D.N.Y. 2011) (discussing impairment of *Debtor's* exemption) (emphasis added); *see also Levinson v. R&E Prop. Corp.*, 395 B.R. 554, 557 (E.D.N.Y. 2008) (same); *In re Armenakis*, 406 B.R. 589, 617 (Bankr. S.D.N.Y. 2009) (same).

Thus, in cases where only one tenant by the entirety has filed for bankruptcy relief, the proper method for calculating equity for purposes of judicial lien avoidance under § 522(f)(1)(A) is as follows: (1) use the full fair market value of the debtor's principal residence; (2) subtract all mortgage liens and all other liens of record on the principal residence; (3) apply the full amount of the debtor's homestead exemption as if there were no liens on the principal residence; (4) if there is any equity remaining in the principal residence after satisfying all other liens and the debtor's homestead exemption, the judicial lien may attach to that remaining equity; and (5) any judicial lien that can be avoided as set forth above is avoided in reverse order according to state law priority, meaning that for debtors residing in New York, the most junior of the judicial liens (*i.e.*, the most recently recorded lien) is avoided first, and so on, until either all judicial liens are avoided or until there is some equity to either partially or fully secure a judicial lien. *See In re Heaney*, 453 B.R. at 48–49; *see also In re Healey*, 2017 WL 4838557, at *2; *In re Moltisanti*, 2012 WL 5246509, at *3. Section 522(f)(2)(B) provides that "[i]n the case of a property subject to more than 1 lien, a lien that has been avoided shall not be considered in making the calculation under subparagraph (A) with respect to other liens." 11 U.S.C. § 522(f)(2)(B). When there is more than one potentially avoidable lien, each lien's avoidance is assessed in reverse order of that's lien's priority under New York state law. *See In re Heaney*, 453 B.R. at 48 (citing *In re Napolitano*, No. 09–30269, 2009 WL 2905608, at *3 (Bankr. N.D.N.Y. July 1, 2009)). In simpler terms, each lower priority lien is avoided until the sum of all remaining liens, non-avoidable as well as potentially avoidable liens, plus the exemption amount, does not exceed the value of the property. *See In re Heaney*, 453 B.R. at 49.

Courts have consistently held that valuation is "not an exact science." *In re Levin*, No. 8-17-77330-las, 2020 Bankr. LEXIS 1127, at *5 (Bankr. E.D.N.Y. Apr. 24, 2020) (citations omitted).

10

Courts are not bound by appraisals presented in determining the value of real property, and the Court may form its own opinion after considering the appraisals and the appraisers' testimony. *See In re Pod*, 560 B.R. 77, 80 (Bankr. E.D.N.Y. 2016) (citations omitted). "The Court may look to the accuracy, credibility and methodology employed by the appraisers to determine the proper valuation of real property." *Id*. (internal quotations and citations omitted).

In valuing residential real property under New York law, the typical method used is the comparable sales method. *See, e.g.*, *In re Levin*, No. 8-17-77330-las, 2020 WL 1987783, at *3 (Bankr. E.D.N.Y. Apr. 24, 2020); *see also In re Lepage*, No. 8-10-74093-reg, 2011 WL 1884034, at *5 (Bankr. E.D.N.Y. May 18, 2011). Under the comparable sales method, appraisers research the debtor's marketplace to find several recent sales of similar properties. *See In re Lepage*, 2011 WL 1884034, at *5. "Since every piece of property is unique, the appraiser then adjusts the actual sales prices of the comparables to account for both positive and negative differences between the comparables and the subject property." *Id.* (quoting *In re Maple*, No. 07-10820-cab, 2008 WL 3539793, at *2 n. 2 (Bankr. D. Vt. Aug. 8, 2008), *as amended* (Aug. 11, 2008)). The Court must examine the reasonableness of the adjustments made to each of the comparable sales. *See In re Levin*, 2020 WL 1987783, at *6.

In analyzing comparable sales relied upon in appraisals, courts give more weight to sales that took place no more than 6 months prepetition and 3 months post-petition. *See In re Levin*, 2020 WL 1987783, at *3 (citing *In re Pod*, 560 B.R. at 84). Courts have excluded comparable sales that were sold more than 2 years before the petition date. *See id.* at *6. In addition to the timing of comparable sales, courts also consider other factors such as location, lot size, square footage, condition, and age of the property. *See id.* at *3 (citing *Toal v. Chase Home Finance LLC*

*(In re Toal)*, No. 10-72783-478-dte, Adv. No. 10-8613-478-dte, 2011 WL 3607911, at *3 (Bankr. E.D.N.Y. Aug. 15, 2011)).

When two appraisals conflict, a court should carefully compare "the logic of their analyses'" and "the persuasiveness of their subjective reasoning." *In re Hassan*, No. 14-73711-reg, 2015 WL 5895481, at *5 (Bankr. E.D.N.Y. Oct. 8, 2015) (quoting *In re Park Ave. Partners Ltd. P'ship*, 95 B.R. 605, 610 (Bankr. E.D. Wis. 1988)).  "Although no appraisal is perfect, courts have recognized that more deficiencies in one appraisal adversely affect its reliability when compared to another appraisal also shown to have deficiencies." *In re Pod*, 560 B.R. at 83.

## DISCUSSION

### A.  The Full Market Value of the Property is Used for Lien Avoidance Calculations

#### a.  The Debtor Owns the Property as a Tenant by the Entirety

The Debtor and his non-filing spouse entered into a quitclaim deed to purchase the Property in July 2002.  *See* Motion, Ex. A, at 3.  The quitclaim deed does not specify that the Debtor and his non-filing spouse are joint tenants or tenants in common.  *See id.*  Rather, it states only that the Property was granted to "Michael Culver and Michele Browne, husband and wife . . . ."  *Id.* Therefore, since the quitclaim deed contains no expression of intent not to enter into a tenancy by the entirety, the Debtor and his non-filing spouse purchased the Property as tenants by the entirety. *See* N.Y. Est. Powers & Trusts Law § 6-2.2(b) (2024); *see also In re Heaney*, 453 B.R. at 46.

The Debtor, a tenant by the entirety with his non-filing spouse, is seized of the whole Property.  *See In re Heaney*, 453 B.R. at 46–48.  Therefore, the fair market value of the Property as of the Petition Date is used for calculating whether the Creditor's lien can be avoided.  *See id.* Debtor argues that only his half interest in the Property should be used in calculating whether the Judgment Liens can be avoided, based on: (a) a First Circuit case, *In re Minkinia*, (b) section

363(h), where the trustee is required to turn over half the sale proceeds to a non-debtor spouse, and (c) the fact that upon the death of a spouse, the living spouse is entitled to a separate apportionment of their homestead exemption. *See* Debtor's Reply at ¶¶ 14–15. The Court does not find any of these arguments persuasive. Instead, the Court follows the well-settled law in this Circuit that a tenant by the entirety is seized of the whole property and that the fair market value of the entire property is used for lien avoidance calculations when one tenant by the entirety files for bankruptcy. *See In re Moltisanti*, 2012 WL 5246509, at *3; *In re Heaney*, 453 B.R. at 46–48; *Levinson*, 395 B.R. at 558–59; *In re Armenakis*, 406 B.R. at 617; *In re Healey*, 2017 WL 4838557, at *2; *In re Martin*, 2013 WL 3956384, at *2.

The fair market value of the Property as of the Petition Date is either $1,925,000.00, as provided by the Debtor's Appraisal (as defined herein), or $2,500,000.00, as provided by the Creditor's Appraisal (as defined herein).

### b. Section 522(f)(1)(A) Calculations

If the Debtor's Appraisal is accepted, the Creditor's lien impairs the Debtor's homestead exemption and would be avoided to the extent of $10,902.60:

1. The Salisbury Mortgage, which is not subject to avoidance, is $1,628,837.21.

2. The Debtor's claimed homestead exemption of $149,975.00 exceeds the maximum value allowed for properties in Dutchess County and must therefore be reduced to $125,000.00, which is the maximum homestead exemption that may be claimed for properties in Dutchess County pursuant to N.Y. C.P.L.R. § 5206(d).

3. Subtracting the Salisbury Mortgage and the homestead exemption[14] from the Debtor's claimed value of the Property as of the Petition Date leaves a balance of $171,162.79.

---

[14] $1,628,837.21 (Salisbury Mortgage) plus $125,000.00 (maximum homestead exemption) equals $1,753,837.21.

4. Judicial Liens beyond $171,162.79 would be avoided:

   a. The most senior lien[15] held by Blank Rome LLP would be intact in its entirety, leaving a net equity remaining of $114,909.10 ($171,162.79 - $56,253.69).

   b. The next most senior lien held by Creditor would be intact to the extent of $114,909.10 and avoidable to the extent of $10,902.77 ($125,811.87 - $114,909.1); and

   c. The most junior lien held by M&T Bank would be avoided in its entirety given that there is no equity remaining.

If the Creditor's Appraisal is accepted, the Creditor's lien does not impair the Debtor's homestead exemption and would not be subject to avoidance:

1. Subtracting the Salisbury Mortgage and homestead exemption from the Creditor's claimed value of the Property as of the Petition Date leaves a balance of $746,162.79.

2. Judicial Liens beyond $746,162.79 would be avoided:

   a. The most senior lien held by Blank Rome LLP in the amount of $56,253.69 would be intact in its entirety, leaving a net remaining equity of $689,909.10 ($746,162,79 - $56,253.69);

   b. The next most senior lien held by Creditor in the amount of $125,811.87 would also be intact in its entirety, leaving a net remaining equity of $564,097.23 ($689,909.10 - $125,811.87); and

---

[15] Blank Rome LLP's lien was recorded on March 4, 2016, at 2:43 p.m. (prevailing Eastern Time); the Creditor's lien was recorded on December 28, 2018, at 11:53 a.m. (prevailing Eastern Time); and M&T Bank's lien was recorded on May 14, 2021, at 2:10 p.m. (prevailing Eastern Time). Therefore, Blank Rome LLP's lien is the most senior, followed by the Creditor's lien, with M&T Bank's lien being the most junior. *See, e.g.*, *United States v. McCombs*, 30 F.3d 310, 321 (2d Cir. 1994) (explaining that New York follows the general principle of "first in time is first in right," meaning that the first recorded lien typically holds the highest priority); *see also Don King Prods. v. Thomas*, 945 F.2d 529, 533 (2d Cir. 1991) (same); *United States v. City of New Britain*, 347 U.S. 81, 87 (1954) (holding that "the first in time is the first in right" when two statutory liens attach to the same real estate).

c. The most junior lien held by M&T Bank in the amount of $919,061.57 would be intact to the extent of $564,097.23 and avoidable to the extent of $354,964.34 ($919,061.57 - $564,097.23).

**B. The Creditor's Valuation is More Reliable**

Courts have recognized that where there is a significant difference in value between a debtor's appraisal of a property and the secured creditor's appraisal of a property, the accuracy of the debtor's appraisal is called into question. *See In re Pod*, 560 B.R. at 82. This is because the Debtor, as the moving party to demonstrate that there is not even one dollar of value in the property to support the lien which it seeks to avoid, bears the burden of proof on valuation. *See In re Fisher*, 289 B.R. 544, 547 (Bankr. W.D.N.Y. 2003).

**a. The Two Appraisals Have Significantly Different Market Values**

The Debtor's Appraisal lists the value of the Property as $1,925,000.00 as of the Petition Date, while the Creditor's Appraisal lists the value of the Property as $2,500,000.00 as of the Petition Date. *See Debtor/Movant's Trial Exhibits*, Ex. 3 [ECF No. 192] (the "Debtor's Appraisal"); *Creditor's Trial Exhibits*, Ex. B [ECF No. 193] (the "Creditor's Appraisal"). The difference in value between the two appraisals is $575,000.00, which is clearly a "significant" difference. *See In re Pod*, 560 B.R. at 79 (finding a $110,000.00 difference to be "significant"); *see also In re Robinson*, No. 14-11559-bah, 2015 WL 5309513 (Bankr. D.N.H. Sept. 10, 2015) (finding a $100,700.00 difference to be significant). The accuracy of the Debtor's Appraisal is called into question, and the Court must inquire into the comparables and methodologies used by the Debtor's Appraiser and compare it to those used by the Creditor's Appraiser.

Both the Debtor's Appraiser and Creditor's Appraiser used comparable sales to value the Property and the different comparables and adjustments chosen by each appraiser resulted in a

significant difference in the assessed values of the Property.  The sales comparison approach takes

properties that are sold in the general proximity of the subject property and compares them with

the subject property, monetarily adjusting for differences in order to determine an approximate

market value of the subject.  *See, e.g.*, *In re Lepage*, 2011 WL 1884034, at *5.  The Debtor's

Appraisal was made effective on July 5, 2023, while the Creditor's Appraisal was made effective

on October 18, 2023.  *See* Debtor's Appraisal at 1; Creditor's Appraisal at 1.

### b.  The Creditor's Appraisal Used Comparables with a Narrower Price Range

The Debtor's Appraisal lists six comparables with sale prices ranging between

$1,525,000.00 and $2,750,000.00, or a difference of 45%, while the Creditor's Appraisal lists four

comparables with sale prices ranging between $2,270,000.00 and $3,200,000.00, or a difference

of 29%.  *See* Debtor's Appraisal at 3, 5; Creditor's Appraisal at 4–5.  Since the Debtor's Appraisal

uses comparables with a much wider price range than the Creditor's Appraisal, the comparable

sales utilized in the Debtor's Appraisal are less credible with respect to price in determining a

credible estimate of market value of the subject Property.  In fact, Debtor's Appraiser testified at

the Deposition of Deposition of Debtor's Appraiser, and confirmed at the Trial, that a higher

percentage differential in sales price made her appraisal less credible than the Creditor's Appraisal,

which had a lower percentage differential in sales price.  *See* Deposition of Debtor's Appraiser at

65:7–23; Trial Tr. at 160:12–162:9.

### c.  Neither Appraisal Used Comparables within 6 Months Prepetition or 3 Months Post-Petition, but the Creditor's Appraisal Used More Recent Comparable Sales

Although one of the comparable sales utilized in the Creditor's Appraisal took place 4

months post-petition and was closer to the Petition Date than any of the comparables used in the

Debtor's Appraisal, none of the comparable sales utilized in either appraisal took place within 6

months prepetition or 3 months post-petition.[16]  *See* Creditor's Appraisal p. 5.  Each comparable

sale is accorded equal weight with respect to the timing of those sales.  *See In re Pod*, 560 B.R. at

84.  Although 4 of the 6 comparables used in the Debtor's Appraisal occurred in 2021, they were

all within 2 years of the Petition Date and will therefore not be excluded from consideration.  *See*

*In re Levin*, 2020 WL 1987783, at *6.

### d.  Other Factors

In addition to the sale price and timing of the comparable sales, the Debtor's Appraisal and

Creditor's Appraisal diverge on a number of factors considered in the sales comparison approach,

including with respect to the (a) age, (b) acreage, (c) distance from the Property, and (d) gross

living area ("GLA").  Each comparable and the adjustments made to it[17] had an impact on the

ultimate value that the appraiser assigned to the Property.[18]

---

[16] It should be noted that the fourth comparable sale utilized in the Creditor's Appraisal, which closed on August 24, 2023, was not accorded significant weight in determining the value of the Property according to the Creditor's Appraiser.  *See* Trial Tr. at 111:22–117:1; *see also* Deposition of Creditor's Appraiser at 39:14–24.  The Creditor's Appraisal uses one comparable sale from 2021, two comparable sales from 2022, and one comparable sale from 2023. *See* Creditor's Appraisal at 4–5.  The Creditor's Appraiser cites "low turnover of sales within the past year" and "sharp increases in market values over the previous two years" as justification for using comparables from 2021 and 2022. *Id.* at 8.  In contrast, according to the Debtor's Appraisal, "[d]ue to the lack of more recent sales in 2022/2023, sales were [exclusively] used from 2021.  The [Debtor's] [A]ppraiser did not find the need to make Time of Sale adjustments, [as] properties have not shown to decline or increase within the last two years."  Debtor's Appraisal at 2.

[17] Creditor's Appraiser contends that there are non-USPAP (as defined herein) guidelines from Fannie Mae and Freddie Mac regarding single line, net and gross adjustments to comparable properties that govern here.  *See* Trial Tr. at 90:18–91:8.  These adjustments, according to Creditor's Appraiser, should not exceed 10% for single-line adjustments, 15% for net adjustments, and 25% for gross adjustments.  *See id.* at 90:18–20; *see also* Creditor's Declaration at 6; Creditor's Closing Statement at 6–8.  Creditor's Appraiser concedes that these guidelines are used by banks for mortgage purposes and Creditor does not provide any authority that courts consider the Fannie Mae and Freddie Mac guidelines for purposes of valuing property under the comparable sales approach.  *See* Trial Tr. at 90:25–91:3.  In addition, Debtor Appraiser does not purport to be bound by such guidelines.  *See City of Almaty v. Ablyazov*, 2021 U.S. Dist. LEXIS 214695, *22 (Bankr. S.D.N.Y. 2021) (holding that where an expert is bound by, or purports to be bound by, established standards for arriving at conclusions in a particular field, courts look to the extent of compliance with such standards).  Thus, the Court will not consider these guidelines.

[18] With the exception of the fourth comparable used by the Creditor's Appraiser, all comparables were accorded equal weight in determining the estimated fair market value of the subject Property.  *See supra* note 16.

i.    **The Creditor's Appraisal used Comparables Closer in Age to the Subject Property**

It is undisputed that the age of the Property is 17 years.  *See* Debtor's Appraisal at 2; Creditor's Appraisal at 4–5.  The Debtor's Appraisal used comparable sales of properties ranging from 7 years to 222 years in age.  *See* Debtor's Appraisal at 3, 5.  The Creditor's Appraisal used comparable sales of properties ranging from 23 years to 148 years in age.  *See* Creditor's Appraisal at 4–5.  Neither appraisal made adjustments for age.  *See id.* at 8; *see also* Debtor's Appraisal at 8.  Therefore, the Creditor's Appraisal used comparables that were closer in age to the subject Property and are more credible as to age.

ii.    **The Debtor's Appraisal Used Comparables that are Closer in Acreage to the Subject Property but Made Larger Adjustments per Acre**

It is undisputed that the Property covers 104 acres.  *See* Debtor's Appraisal at 3, 5; Creditor's Appraisal at 4–5; *see also* Creditor's Declaration at 3.  The Debtor's Appraisal used comparable sales of properties ranging from 40 acres to 97.01 acres.  *See* Debtor's Appraisal at 3, 5.  The Creditor's Appraisal used comparable sales of properties ranging from 20 acres to 160.78 acres.  *See* Creditor's Appraisal at 4–5.  While neither appraisal is a perfect fit, the comparables used in the Debtor's Appraisal are closer in acreage to the subject Property.  However, the Debtor's Appraiser used a $5,000 adjustment per acre while the Creditor's Appraiser used a $2,000 adjustment per acre.  *See* Trial Tr. at 84:1–85:15; *see also* Debtor's Appraisal at 8; Creditor's Appraisal at 8.  The Creditor's Appraiser explained under oath that a $2,000 per acre adjustment is more credible for jumbo properties (like the subject Property and the comparable properties) because excess land yields diminishing returns per additional acre.  *See* Trial Tr. at 82:21–86:7.  Therefore, even though the comparables used by the Debtor's Appraisal are closer in acreage to the subject Property, the adjustments made per acre by the Debtor's Appraisal were significantly

inflated, casting doubt on the ultimate market price determined by the Debtor's Appraiser as set forth in the Debtor's Appraisal.

### iii.    The Creditor's Appraisal Used Comparables Closer in Distance to the Subject Property

The Debtor's Appraisal used comparable sales of properties ranging from 5.23 miles North of the Property to 17.87 miles South of the Property. *See* Debtor's Appraisal at 3, 5. The Creditor's Appraisal used comparable sales of properties ranging from 3.93 miles Southwest of the Property to 17.85 miles Northwest of the Property. *See* Creditor's Appraisal at 4. While neither appraisal used comparables that are all within a short distance or within the same immediate neighborhood of the subject Property,[19] the comparables used in the Creditor's Appraisal are closer in distance to the Property than the ones used in the Debtor's Appraisal.

### iv.    The Creditor's Appraisal Used Comparables with a Closer GLA to the Subject Property

The Property has a GLA of either 4,168 square feet, as provided by the Debtor's Appraisal, or 4,236 square feet, as provided by the Creditor's Appraisal. *See* Debtor's Appraisal at 3, 5; Creditor's Appraisal at 4–5. The Debtor's Appraisal used comparable sales of properties with GLA's ranging from 3,923 square feet to 7,146 square feet and made adjustments in the amount of $100.00 per square foot. *See* Debtor's Appraisal at 5, 8. The Creditor's Appraisal used comparable sales of properties with GLA's ranging from 3,429 square feet to 6,560 square feet and made adjustments in the amount of $75.00 per square foot for differences in GLA greater than 100 square feet. *See* Creditor's Appraisal at 4–5, 8. Assuming the subject Property has a GLA of

---

[19] The Creditor's Appraiser notes that, "in [his] judgment[,] within the subjects more immediate neighborhood, there is a lack of representative active listings available for use in the analysis. As such, it is necessary to use sales[] deemed most representative and best available in competing neighborhoods[,] [some of] which exceed 15 miles." Creditor's Appraisal at 8.

approximately 4,200 square feet, the comparables used in the Creditor's Appraisal are closer in

value with respect to GLA of the subject Property.

### v.    The Debtor's Appraiser did not Comply with USPAP Guidelines

The Uniform Standards of Professional Appraisal Practice ("USPAP"), while not binding,

serve as guiding principles for best appraisal practices in the United States. *See, e.g.*, *Fed. Hous.*

*Fin. Agency v. Nomura Holding Am., Inc*., 104 F. Supp. 3d 441, 508 (S.D.N.Y. 2015), *aff'd sub*

*nom. Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d

85 (2d Cir. 2017) ("[U]nder current law, as enacted by the Dodd–Frank Wall Street Reform and

Consumer Protection Act ("Dodd–Frank"), Pub. L. No. 111–203, 124 Stat. 1376 (2010),

'appropriate standards for the performance of real estate appraisals . . . shall require, at a

minimum—that such appraisals shall be subject to appropriate review for compliance with the

Uniform Standards of Professional Appraisal Practice.'") (citing 12 U.S.C. § 3339(3)).  Further,

"[w]here an expert is bound by, or purports to be bound by, established standards for arriving at

conclusions in a particular field, courts have looked to the extent of the expert's compliance with

such standards in assessing the expert's reliability."  *City of Almaty v. Ablyazov*, 2021 U.S. Dist.

LEXIS 214695, *22 (Bankr. S.D.N.Y. 2021) (quoting *S.E.C. v. Yorkville Advisors, LLC*, 305 F.

Supp. 3d 486, 504 (S.D.N.Y. 2018)).  Courts in this district have "repeatedly excluded experts who

certified that they complied with the USPAP but whose methods nevertheless departed from the

USPAP." *City of Almaty v. Ablyazov*, 2021 U.S. Dist. LEXIS 214695, *22 (citing cases).

The "Record Keeping Rule" in USPAP requires appraisers to create and maintain a

workfile for each appraisal, which must include all "data, information, and documentation

necessary to support the appraiser's opinions and conclusions and to show compliance with

USPAP." *Uniform Standards of Professional Appraisal Practice*, Definition of "Workfile" (2020–

2021); *see also Fed. Hous. Fin. Agency*, 104 F. Supp. 3d at 509, *aff'd sub nom. Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n*, 873 F.3d 85 (2d. Cir. 2017) (describing the prior iteration of the "Record Keeping Rule" which required appraisals to "communicate each analysis, opinion, and conclusion in a manner that is not misleading" and providing standards that dictate what an appraisal report must contain in order to not be "misleading"). "An appraiser having custody of a workfile must allow other appraisers with workfile obligations related to an assignment appropriate access [to] and retrieval [of the workfile]." *Uniform Standards of Professional Appraisal Practice*, Record Keeping Rule (2020–2021). The purpose of an appraiser's workfile is to serve as a record of the appraiser's work and to support their opinions and conclusions. *See generally* Creditor's Declaration at 4.

Debtor's Appraiser concedes that she is familiar with USPAP's rules and regulations and that her workfile complies with USPAP "[i]n a way[.]" Trial Tr. at 53:2–10. The Debtor's Appraiser's workfile that was provided to the Creditor's Appraiser prior to the Deposition of Creditor's Appraiser did not contain any information or documentation to support the opinions and conclusions in the Debtor's Appraisal that were made by the Debtor's Appraiser, in violation of USPAP's Record Keeping Rule. *See* Trial Tr. at 39:15–24, 42:6–47:13, 53:12–14, 54:16–18, 55:25–56:10, 152:15–19; *see also* Creditor's Declaration at 4; Creditor's Closing Statement at 3, 5; *Uniform Standards of Professional Appraisal Practice*, Record Keeping Rule (2020–2021). The Debtor's Appraiser admitted under oath that she did not include any supporting documentation in her workfile that was shared with the Creditor's Appraiser because she "do[es not] want to waste paper." Trial Tr. at 53:13; *see also id.* at 54:16–18, 55:25–56:10. In contrast, the Creditor's Appraiser exchanged a detailed workfile with the Debtor's Appraiser prior to the Deposition of the

Debtor's Appraiser and with the Court,[20] consistent with USPAP. *See id.* at 97:13–17, 154:11–155:10. The Court does not find it persuasive that a supposed "waste of paper" justifies failing to provide supporting documentation in connection with a workfile. In fact, Debtor's Appraiser herself concedes that failure to comply with USPAP's requirements regarding workfiles would subject an appraiser to sanctions. *See id.* at 39:15–24. It would not be a "waste" at all to share information that supports Debtor's Appraiser's conclusions particularly when there is a dispute regarding her valuation of the subject Property and the methodologies she used to arrive at her valuation.

As explained *supra*, the accuracy of the Debtor's Appraisal is called into question because of the significant difference in value between the Debtor's Appraisal and Creditor's Appraisal and the Debtor's burden of proof on valuation. Since the Court finds the Creditor's Appraisal to be more credible on at least five factors (price range, timing, age, distance, and GLA of comparables), and the Debtor's Appraisal violated USPAP, the Court agrees with the Creditor's Appraisal that the value of the Property as of the Petition Date is $2,500,000.00.

## CONCLUSION

For the foregoing reasons, the Court denies the Motion and sustains the Objection because the Creditor's lien does not impair the Debtor's homestead exemption and is not avoidable based on the full fair market value of the Property as determined by the Creditor's Appraisal, which is $2,500,000.00. Although Blank Rome LLP did not object to the Motion, Blank Rome LLP's lien does not impair the Debtor's homestead exemption and is also not avoidable based on the

---

[20] The Creditor's Appraiser's workfile, which was separate from the appraisal report and addendum that explained the assumptions, limiting conditions, and adjustments made for the comparables used, is attached as Exhibit C to the trial binder that was mailed to the Poughkeepsie chambers in advance of the Trial. *See Creditor's Trial Exhibits*, Ex. C [ECF No. 193]. Noticeably absent from the Debtor's trial binder that was mailed to the Poughkeepsie chambers in advance of the Trial was the Debtor's Appraiser's workfile, although the trial binder included an addendum (as part of her appraisal report) that explained the assumptions, limiting conditions, and adjustments made for the comparables used. *See Debtor/Movant's Trial Exhibits*, Ex. 2 [ECF No. 192].

$2,500,000.00 valuation of the Property.  Creditor's counsel shall submit an order consistent with this Memorandum of Decision.



**/s/ Cecelia G. Morris**
_____
**Hon. Cecelia G. Morris**
**U.S. Bankruptcy Judge**

**Dated: October 17, 2025**
**Poughkeepsie, New York**